UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE SUBPOENA OF          Misc. Case No. 18-51013
CENTER FOR MILITARY        Honorable Nancy G. Edmunds
READINESS                  Magistrate Judge Elizabeth A. Stafford


-------------------------------------------------------------------------------------------------

*Underlying Case:*


RYAN KARNOSKI, *et al.*,

        Plaintiffs,

                      United States District Court
                      Western District of Washington
v.                    Civil Action No.: 2:17-cv-01297-MJP


DONALD J. TRUMP, in his
official capacity as President of
the United States, *et al.*,

        Defendants.

_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN
PART PLAINTIFFS' MOTION TO COMPEL DISCOVERY [ECF NO. 1],
AND TO GRANT IN PART AND DENY IN PART
THE CENTER FOR MILITARY READINESS'S
<u>MOTION FOR PROTECTIVE ORDER [ECF NO. 10]</u>**

## I.      Introduction

Plaintiffs filed a motion to compel production of documents subpoenaed from non-party Center for Military Readiness (CMR) of Livonia, Michigan.  [ECF No. 1].[1]  The subpoena *duces tecum*, issued under Federal Rule of Civil Procedure 45, arises from *Karnoski, et al.*, *v. Trump, et al.,* No. 2:17-cv-01297, which is pending in the United States District Court for the Western District of Washington.  [*Id.*, at PageID.4].  The subpoena seeks documented communications between CMR and government officials related to the allegedly unconstitutional policy of disqualifying transgender people from serving in the military.

CMR objected to the subpoena and refused to produce any documents.  [*Id.*]  Plaintiffs thus filed their motion to compel.  CMR both responded to plaintiffs' motion and moved for a protective order, and plaintiffs and CMR replied to each other's responses. [ECF Nos. 10, 12, 15].  Plaintiffs also filed a notice of an order signed by District Judge Marsha J. Pechman, who presides over the underlying action in the Western District of Washington.  [ECF No. 14]  In that order, Judge Pechman granted plaintiffs' motion to compel discovery and denied the

---

[1]The Honorable Nancy G. Edmunds referred this motion to the undersigned for hearing and determination, [ECF No. 2].

government's motion for a protective order.  [ECF No. 14-1].[2]

In this Court, the Honorable Nancy G. Edmunds granted the government's motion for leave to respond to plaintiffs' motion to compel. [ECF No. 24].  The government then filed its response as well as notices of a Ninth Circuit stay of proceedings in the Western District of Washington pending an appeal, and of an order from the District of Maryland holding in abeyance consideration of a similar third-party subpoena pending the Ninth Circuit's decision.  [ECF Nos. 26, 29, 33].  Plaintiffs filed a reply to the government's brief.  [ECF No. 31], and the Court held a hearing on October 23, 2018.

As set for below, the Court recommends that plaintiffs' motion to compel and CMR's motion for protective order should both be granted in part and denied in part.  Specifically, the time period described in the subpoena should be narrowed, and plaintiffs' requests to compel communications between CMR and rank-and-file servicemembers should be denied.

## II.    Background

In an August 25, 2017 press release, President Donald J. Trump

_____

[2]The citation for this opinion is *Karnoski v. Trump*, ___ F.Supp.3d___; 2018 WL 3608401, at *1 (W.D. Wash. July 27, 2018).

announced that he was rescinding a policy established by the prior administration to allow openly transgender individuals to serve in the military and receive military funding for sex-reassignment procedures. [ECF No. 29-1].  The August 2017 directives were scheduled to take effect on March 23, 2018, and President Trump ordered the Secretaries of the Department of Defense (DoD) and the Department of Homeland Security (DHS) to submit a plan for implementation of those directives by February 21, 2018.  [*Id.*].

In September 2017, Secretary of Defense James Mattis issued a memorandum to the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff to lead the implementation of President Trump's August 2017 announced policy on military service by transgender individuals.  [ECF No. 29-2].  Secretary Mattis instructed that a "Panel of Experts" should conduct a multi-disciplinary review of information pertaining to "medical care and treatment, personnel management, general policies and practices, and other matters, including the effects of the service of transgender persons on military readiness, lethality, deployability, and unit cohesion."  [*Id.*].  Relevant here, the Panel of Experts was permitted to "obtain advice from outside experts on an individual basis."  [*Id.*].

As directed by President Trump, Secretary Mattis issued a

memorandum on February 22, 2018 adopting the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

[ECF No. 29-3, PageID.427-38].  After the DOD adopted these policies, President Trump revoked his August 2017 directive.  [ECF No. 29-5].

Shortly after President Trump issued his August 2017 directive, nine transgender individuals who serve in the military, including one who does not serve openly, joined with three organizations to file a lawsuit against President Trump, Secretary Mattis, the United States and the DoD in the Western District of Washington challenging the constitutionality of the announced "Ban."  *Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL

1784464, at *4 (W.D. Wash. Apr. 13, 2018).[3]  Judge Pechman (and three

other federal judges)[4] imposed a nationwide preliminary injunction in

December 2017 barring defendants from implementing the Ban.  *Id.* at *1.

After Secretary Mattis issued the policies in February 2018 to

implement President Trump's directive, the parties filed cross motions for

summary judgment, with the plaintiffs contending that "the Ban is

unsupported by any constitutionally adequate government interest as a

matter of law, and therefore violates equal protection, substantive due

process, and the First Amendment."  *Id.* at *5.  The government countered

that the plaintiff's challenges were moot because President Trump had

revoked the August 2017 directive.  [*Id.*].  Rejecting that argument, Judge

---

[3]"Individual Plaintiffs Ryan Karnoski, D.L., and Connor Callahan aspire to enlist in the military; Staff Sergeant Cathrine Schmid, Chief Warrant Officer Lindsey Muller, Petty Officer First Class Terece Lewis, Petty Officer Second Class Phillip Stephens, and Petty Officer Second Class Megan Winters currently serve openly in the military. (Id. at ¶¶ 7-13.) Individual Plaintiff Jane Doe currently serves in the military, but does not serve openly. (Id. at ¶ 14.) Organizational Plaintiffs include the Human Rights Campaign ('HRC'), the Gender Justice League ('GJL'), and the American Military Partner Association ('AMPA')." *Karnoski*, 2018 WL 1784464 at *4. The state of Washington was later allowed to intervene in challenging the Ban.  *Id.*

[4]The citations of the opinions of the other three district courts that entered preliminary injunctions against the Ban are *Doe 1 v. Trump*, 275 F.Supp.3d 167 (D.D.C. 2017); *Stone v. Trump*, 280 F.Supp.3d 747 (D. Md. 2017); and *Stockman v. Trump*, No. 17-cv-1799-JGB-KK, Dkt. No. 79 (C.D. Cal. Dec. 22, 2017).

Pechman found "that the 2018 Memorandum and the Implementation Plan do not substantively rescind or revoke the Ban, but instead threaten the very same violations that caused it and other courts to enjoin the Ban in the first place." *Id.* at *6. She also noted that "[t]he 2017 Memorandum did not direct Secretary Mattis to determine *whether* or not the directives should be implemented, but instead ordered the directives to be implemented by specific dates and requested a plan for *how* to do so." *Id.* at *6 (emphasis in original). Judge Pechman thus refused to dissolve the preliminary injunction and reiterated that the government was "enjoined from taking any action relative to transgender people that is inconsistent with the status quo that existed prior to President Trump's July 26, 2017 announcement." *Id.* at 14.

Turning to the plaintiffs' constitutional challenges, Judge Pechman examined the history of discrimination, contributions to society, immutability and political power relating to transgender people and concluded "that they are a suspect class, such that the Ban must satisfy the most exacting level of scrutiny if it is to survive." *Id.* at 9. She then addressed the ordinary deference owed "where a policy results from the 'professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Id.* at 11 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507-08

(1986).  Deference is not owed to "a policy [that] is adopted 'casually, over the military's objections and without significant deliberation.'"  *Id.* (quoting *Owens v. Brown*, 455 F.Supp. 291, 305 (D.D.C. 1978)).

Judge Pechman concluded that President Trump's initial pronouncement of the Ban in August 2017 was not supported by considered reason or deliberation, and was in fact "'actually contradicted by studies, conclusions and the judgment of military itself.'"  *Id.* (quoting *Doe 1 v. Trump*, 275 F.Supp.3d 167, 2012 (D.D.C. 2017) (emphasis in *Doe 1*). But she denied summary judgment concerning the deference owed to the February 2018 DoD implementation of the Ban because, at that juncture, she could not "determine whether the DoD's deliberative process— including the timing and thoroughness of its study and the soundness of the medical and other evidence it relied upon—is of the type to which Courts typically should defer."  *Id.* at 11-12.

With these findings, Judge Pechman ordered the parties to proceed with discovery, but the government objected to each of the plaintiffs' discovery requests based on the deliberative process privilege. *Karnoski v. Trump*, ___ F.Supp.3d ___, 2018 WL 3608401 (W.D. Wash. 2018).  The plaintiffs thus filed a motion to compel and the government filed a motion for protective order.  *Id.*  Among other arguments, the government

asserted that plaintiffs "must exhaust other sources of non-privileged discovery, meet a heavy, initial burden of establishing a heightened, particularized need for the specific information or documents sought, and at a minimum substantially narrow any requests directed at presidential deliberations."  [ECF No. 29-8, Page 1].  In a July 2018 opinion, Judge Pechman held that the deliberative process privilege did not apply and found no support for the government's argument that the plaintiffs were required to exhaust other sources of non-privileged discovery.  *Karnoski,* 2018 WL 3608401 at *5-*6.  She thus granted the motion to compel and denied the government a protective order.  *Id.*

In May 2018, the government appealed Judge Pechman's preliminary injunction, arguing that she erred by refusing to dissolve the injunction following the adoption of DoD's February 2018 policy.  [ECF No. 29-6].  The government argued that the initial Ban directed by President Trump is now moot; that the injunction poses a substantial risk to military readiness; and that the injunction should be least narrowed to address injuries to the plaintiffs rather than a nationwide injunction.  [*Id.*].

In August 2018, the government also petitioned the Ninth Circuit to stay the discovery order pending the appeal. [ECF No. 29-7].  The government asserted that the discovery order may require disclosure of

privileged information and threatened to disrupt operations of the Executive

Branch.  [*Id.*].  And, said the government, Judge Pechman erred by

applying a strict scrutiny standard of review; she should have instead

applied a rational basis review based on the deference owed to military

judgment, thus precluding any probe of presidential or military

deliberations. [*Id.*].   The government also reiterated its argument that the

district court should have required the plaintiffs to exhaust other sources of

non-privileged discovery.  [*Id.*].  The Ninth Circuit granted the government's

motion for a stay in September 2018, [ECF No. 26-1], and held oral

arguments on the appeal the following month.

Against this backdrop, this Court considers plaintiffs' motion to

compel CMR to produce documents requested in the subpoena at issue.

The subpoena requests documents for the relevant period that memorialize

communication between CMR, "President Trump, the Executive Office of

the President, the Trump Campaign, Vice President Pence, the Office of

the Vice President, or the Department of Defense, concerning military

service by transgender people, public policy regarding transgender people,

medical treatment for transgender people, and/or transgender people in

general."  [ECF No. 1-1, PageID.24].  The relevant period identified in the

subpoena was June 16, 2015 (when Donald J. Trump announced that he

was running for president) to the present, [*Id.*, PageID.21], but plaintiffs

clarified during the hearing that they are seeking documents dated up to

May 2, 2018 rather than to the present.  The subpoena broadly defines the

Department of Defense as:

> [T]he Secretary of Defense, the Deputy Secretary of Defense,
> any Undersecretary of Defense, any Assistant Secretary of
> Defense, any Deputy Assistant Secretary of Defense, the
> Chairman of the Joint Chiefs of Staff, and any employees or
> officers of the Office of the Secretary of Defense, the
> Department of the Navy, the Department of the Army, and
> Department of the Air Force.

[*Id.*, PageID.22-23].

## III.   Analysis

### A.

As noted, plaintiffs issued the subpoena to CMR under Rule 45.[5]  The

scope of discovery under Rule 45 is the same as under Federal Rule of

---

[5] The Court considered transferring the motions at issue to the Western
District of Washington under Rule 45(f), which allows such a transfer "if the
person subject to the subpoena consents or if the court finds exceptional
circumstances."  Plaintiffs neither requested nor objected to such a
transfer, and opined at the hearing that this Court was sufficiently
knowledgeable about the record and issues to make an informed decision.
CMR strenuously objects to such a transfer.  The Rule 45 advisory
committee notes emphasize, "The prime concern should be avoiding
burdens on local nonparties subject to subpoenas, and it should not be
assumed that the issuing court is in a superior position to resolve
subpoena-related motions."  After examining the record and the issues
posed, the Court concludes that it is in a sufficient position to resolve the
issues raised and does not recommend transfer over CMR's objections.

Civil Procedure 26(b)(1).  *McGirr v. Rehme*, No. 16-464, 2018 WL
3708357, at *6 (S.D. Ohio Aug. 3, 2018).  Under Rule 26(b), "[p]arties may
obtain discovery regarding any nonprivileged matter that is relevant to any
party's claim or defense," except that the Court must consider
proportionality factors, including "the importance of the issues at stake in
the action, the amount in controversy, the parties' relative access to
relevant information, the parties' resources, the importance of the discovery
in resolving the issues, and whether the burden or expense of the proposed
discovery outweighs its likely benefit."

Rule 45 requires a party serving a subpoena on a nonparty to "take
reasonable steps to avoid imposing undue burden or expense on a person
subject to the subpoena."  Rule 45(d)(1). Courts are required to enforce
that duty and must quash or modify a subpoena that would subject the
nonparty to an undue burden.  Rule 45(d)(1) & (d)(3)(iv).  These provisions
are intended to prohibit parties from shifting their significant litigation
expenses to nonparties.  *Taylor v. Universal Auto Grp. I, Inc.*, No. 14-MC-
50, 2015 WL 1810316, at *4 (S.D. Ohio Apr. 17, 2015); *Kean v. Van Dyken*,
No. 4:05-CV-64, 2006 WL 374502, at *5 (W.D. Mich. Feb. 16, 2006).

A court may issue an order "to protect a party or person from
annoyance, embarrassment, oppression, or undue burden or expense ...."

12

Fed. R. Civ. P. 26(c).  The party seeking a protective order must show good cause by articulating "specific facts showing clearly defined and serious injury resulting from the discovery sought and cannot rely on mere conclusory statements."   *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (citations and internal quotation marks omitted).

### B.

The Court will begin by addressing the arguments between plaintiffs and CMR.  Plaintiffs argue that records of communication between CMR and the government are relevant because CMR advocated for revoking the prior administration's policy of allowing transgender people to serve in the military.  Plaintiffs cite as an example a report issued by CMR in July 2017—the month prior to President Trump's August 2017 directive—entitled, "The President, Defense Department & Military Services Should Revoke Problematic Transgender Policy Directives and Instructions."[6] Plaintiffs emphasize that Judge Pechman determined that strict scrutiny applies and requires the government to show that it had a compelling state interest rather than any illegitimate reasons, like prejudice or stereotyping, when imposing the Ban. *See Grutter v. Bollinger*, 539 U.S. 306, 333 (2003)

---

[6]https://cmrlink.org/data/sites/85/CMRDocuments/CMR_TransgenderPolAnalysis.pdf (last viewed on November 5, 2018).

13

("The purpose of the narrow tailoring requirement is to ensure that the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.") (internal quotation marks and citation omitted). Plaintiffs also contend that scrutinizing the government's communication with CMR will shed light on whether the Ban is the product of professional military judgment, as the government asserts.

CMR responds that its communications are not relevant to the underlying claims, and that enforcing the subpoena would cause an undue burden and infringe on its First Amendment rights.

### 1.   Relevance

The Court finds that the records plaintiffs' request are relevant except as it relates to documents concerning communication involving non-decisionmakers, and for a narrowed time period.  Arguing that the discovery sought is irrelevant, CMR relies on an affidavit signed by Elaine Donnelly, who says that she is the president and only full-time staff member of CMR, a non-profit organization with the "unique mission" of "reporting and analyzing military/social issues."   [ECF No. 10-1, PageID. 114-15].  By affidavit, Donnelly states that she posts documents publicly to CMR's website and sends mass emails to supporters and sometimes

sends new material to government officials (including the White House and the Pentagon), but that she played no consultative role in the development of the Ban.  [ECF No. 10-1].  She admits to exchanging private emails about CMR's policy positions as it relates to military readiness, including to the 2016 Republican National Platform Committee and members of the Trump campaign.  [*Id.*, PageID.119-20].  Other individuals with whom Donnelly states that she corresponds are service members who provide her with their confidential accounts of operations on the ground.  [*Id.*, PageID.122-23].

At the hearing, CMR also presented portions of the government's privilege log in the underlying matter that identified documents of communications between Donnelly and Steven Jaworski of the Navy in October 2016 as being subject to the deliberate process privilege.  CMR notes that these communications were from before President Trump took office.

But as noted, Donnelly admitted that she exchanged private emails with the Trump campaign.  [ECF No. 10-1, PageID.119-20].  In addition, counsel for the government disclosed at the hearing that documents of communication between CMR and the offices of the President and Vice President exist, although he would not specify when those communications

15

took place.  The government asserts that any relevant documents between officials and CMR that are relevant to underlying litigation are potentially privileged under the consultant corollary of a privilege.[7]  [ECF No. 10, PageID.403, n. 2].  The government in fact contends that the motion to compel at issue here relates to some of the very documents for which the government sought a protective order in the underlying action.  [*Id.*, PageID.406].  CMR's assertion that no relevant documents exist is undermined by Donnelly's admission to exchanging private emails with the Trump campaign as well as the government's assertion of an interest in the motion at issue, its explicit representation that documents between it and CMR exist, and its vociferous arguments that documents in CMR's possession may be subject to the government's deliberative process privilege.

Of further note, Secretary Mattis specifically directed that a Panel of Experts "obtain advice from outside experts on an individual basis."  [ECF No. 29-9].  According to CMR's July 2017 report, its advice would have been, in part, that gender dysphoria is a mental condition that disqualifies transgender individuals from serving in the military.[8]  The DoD report

---

[7] For reasons described below, the Court concludes that the documents in CMR's possession are not privileged.

[8] *See*

16

detailing the reasoning for the current iteration of the Ban echoes that reasoning.  [ECF No. 29-4, PageID.435-36, 440, 444, 450-52].[9]  Because CMR describes itself as having a unique mission to analyze and report on military issues, because CMR issued its July 2017 report just once month prior to President Trump's initial directive, and because the Ban and the reasoning set forth in Secretary Mattis' report echo portions of CMR's July 2017 report, it stands to reason that decisionmakers would and did consult with CMR.  [ECF No. 10-1, PageID.114-15].  CMR repeatedly emphasizes that its state of mind is irrelevant to the issues in the underlying cases, but that argument ignores the fact the communications between CMR and decisionmakers can shed light on the state of mind of the decisionmakers who crafted the policies at issue.

The Court also rejects CMR's argument that the holding of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), deems extrinsic evidence irrelevant.  The presidential proclamation at issue in *Hawaii* "placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing

_____

https://cmrlink.org/data/sites/85/CMRDocuments/CMR_TransgenderPolAnalysis.pdf at 2, 11, 12 and 22 n. 8.
[9] Both CMR's and the DoD's reports include other reasoning.  The Court points to their conclusions regarding the mental health implications of gender dysphoria to highlight that there are similarities between the two reports.

information about their nationals the President deemed inadequate."
*Hawaii*, 138 S. Ct. at 2404.  Although the challengers to the Proclamation
alleged that it was motivated by animus towards Muslims, the Supreme
Court found that it was a proper exercise of the president's statutory
authority to suspend entry into the country based on nationality and that it
was "facially neutral toward religion."  *Id.* at 2413-2418.

CMR quotes *Hawaii* as stating, "[W]hen it comes to collecting
evidence and drawing inferences" on questions of national security, "the
lack of competence on the part of the courts is marked."  *Id.* at 2419
(citation and internal quotations marks omitted).  In the underlying case, the
government also relied on *Hawaii* in responding the plaintiffs' motion to
compel and in advocating for a protective order, but Judge Pechman found
the case before her to be distinguishable.  *Karnoski*, 2018 WL 3608401 at
*2-*3.  She reasoned, "Unlike the policy in *Hawaii*, the Court need not "'look
behind the face' of the Ban, as the Ban is facially discriminatory.'"  *Id.* at * 2.
Judge Pechman noted that she had already determined that the Ban is
subject to strict scrutiny, while the facial neutrality of the Proclamation in
*Hawaii* meant that the issue was "whether the entry policy is plausibly
related to the Government's stated objective to protect the country and
improve vetting processes."  *Id.* at *2; *Hawaii*, 138 S.Ct. at 2420.  She

further reasoned that *Hawaii* did not "purport to address the scope of discovery or the application of any privilege." *Karnoski*, 2018 WL 3608401 at *3.

In addition to Judge Pechman's analysis, the Court notes that *Hawaii* did *not* hold that extrinsic evidence is irrelevant under a deferential standard. To the contrary, the Court assumed that it could "look behind the face of the Proclamation to the extent of applying rational basis review" and "consider plaintiffs' extrinsic evidence." *Hawaii*, 138 S. Ct. at 2420. The Court noted that it "hardly ever strikes down a policy as illegitimate under rational basis scrutiny," but then described some cases in which policies were struck down because they lacked any purpose other than a "'bare ... desire to harm a politically unpopular group." *Id.,* (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)).

One of the opinions *Hawaii* cited was *Romer v. Evans*, 517 U.S. 620 (1996), in which a state enacted a law prohibiting any legislative, executive, or judicial action designed to protect homosexual persons from discrimination. *Romer* emphasized that respect for the Constitution's guarantee of equal protection was "why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare." *Romer*, 517 U.S. at 633. Given the holding of *Romer*, this Court cannot presume

19

that the Ninth Circuit will apply the holding in *Hawaii* to a Ban that singles out transgender persons as being disfavored for serving in the military.

More fundamentally, even if the Ninth Circuit decides that the Ban should reviewed under the deferential rational basis test, Judge Pechman and any reviewing court can still to look behind the face of the Ban and consider extrinsic evidence. *Hawaii*, 138 S. Ct. at 2420. *See also Davis v. Prison Health Servs.*, 679 F.3d 433, 438-40 (6th Cir. 2012) (holding that plaintiff's claim sexual orientation discrimination was governed by rational basis review, but that he was entitled to discovery to develop his claim); *Dumont v. Lyon*, No. 17-CV-13080, 2018 WL 4385667, at *23 (E.D. Mich. Sept. 14, 2018) (plaintiffs were entitled to discovery to support claim that state practice lacked rational basis).  For these reasons, the Court cannot accept CMR's argument that the evidence plaintiffs seek through the subpoena at issue is irrelevant under the holding of *Hawaii*.

But the Court does find that plaintiffs' subpoena is overly broad. Plaintiffs seek documents from every member of the DoD, including rank-and-file employees and officers who are not decisionmakers and do have the status to routinely influence policy.  Plaintiffs acknowledged at the hearing that they have a list that identifies the Panel of Experts, but they contend that they have no way of knowing every member of the DoD who

might have been consulted about the policies regarding the military service of transgender individuals.

Regardless, plaintiffs' argument that any DoD employee's communication might be relevant is a stretch. It is true that statements made by members of a decisionmaking body are highly relevant to show that a policy was motivated by invidious discrimination. *See, e.g.*, *League of Women Voters of Michigan v. Johnson*, No. 17-14148, 2018 WL 2335805, at *4 (E.D. Mich. May 23, 2018) (enforcing nonparty subpoenas for documents of communications between legislators or staff members and third parties with whom they consulted). But plaintiffs cite no authority for their contention that statements made by non-decisionmaking government personnel are relevant.

Finally, plaintiffs do not explain the relevance of any communications after March 23, 2018, the date on which President Trump accepted the DoD policies and rescinded his August 2017 directive. [ECF No. 29-5].

## 2. *Proportionality*

Turning to the proportionality factors, the importance of the issues at stake is quite high. "Generally, an action to vindicate a citizen's civil rights is considered of high importance." *Cratty v. City of Wyandotte*, 296 F. Supp. 3d 854, 860 (E.D. Mich. 2017) (citing Hon. Elizabeth D. Laporte,

21

Jonathan M. Redgrave, *A Practical Guide to Achieving Proportionality Under New Federal Rule of Civil Procedure 26*, 9 Fed. Cts. L. Rev. 19, 61 (2015)).  Here, plaintiffs are seeking to vindicate the rights of thousands of transgender individuals who serve[10] or wish to serve in the military; the importance of this case is quantifiably higher than in a routine civil rights case.  With respect to the parties' relative access to information, plaintiffs have been unable to obtain discovery regarding the government's communication with outside consultants and were specifically told by the government that they needed to first obtain the discovery from other sources.  And although CMR has objected that complying with the subpoena will be burdensome, plaintiffs stated during the hearing that they will reimburse CMR for reasonable expenses associated with compliance.[11]

Thus, consideration of the proportionality factors supports plaintiffs' motion to compel the narrowed range of documents that reveals communications between CMR and the decisionmakers who crafted the Ban.

---

[10] *See* ECF No. 29-4, PageID.443 for the estimates of the number of current transgender service members.

[11] Prior to initiating this action, plaintiffs and CMR discussed whether plaintiffs would cover the costs, but the parties did not reach an agreement. [ECF No. 1-1, PageID.51-58].  At the hearing, plaintiffs confirmed that they would pay CMR's reasonable expenses with no cap.

### 3.     *The First Amendment*

CMR argues that compelling it to produce the discovery requested by the subpoena would violate its rights under the First Amendment in that it would burden and chill the exercise of its protected speech.  "A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment privilege." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). That privilege protects against a forced "[d]isclosures of political affiliations and activities" that would have a deterrent effect on the exercise of free speech or freedom of association rights. *Id.*

But "Perry and its progeny have all dealt with the disclosure of either the identity of association members or internal communications—not communications with third parties, let alone public officials."  *Sol v. Whiting*, No. CV-10-01061-PHX-SRB, 2013 WL 12098752, at *3 (D. Ariz. Dec. 11, 2013).  There is no "law that protects from public view communications with public officials in their official capacity about a matter of public concern."  *Id.* at *2.  So contrary to its argument, CMR does not enjoy a "First Amendment right not only to lobby the government, but to do so secretly." *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage* Comm'n, No. A-15-CV-134-RP, 2016 WL 5922315, at *8 (W.D. Tex. Oct. 11, 2016).  *See also In re*

*Anonymous Online Speakers*, 661 F.3d 1168, 1174 (9th Cir. 2011) (stating that the holding in *Perry* "was limited to private internal campaign communications concerning the formulation of campaign strategies and messages") (internal quotation marks omitted); *Dunnet Bay Constr. Co. v. Hannig*, 2011 WL 5417123, at *3 (C.D. Ill. Nov. 9, 2011) (interpreting *Perry's* holding as "protect[ing] against the disclosure of the identity of members and the content of internal communications between members, employees, and agents of political campaigns"). None of the authority CMR cites supports its claim that it may cloak in secrecy its communications with public officials in their official capacity about the matter of public concern at issue here.  [*See* ECF No. 10, PageID.105-06].

In summary, except for the request for communications involving rank-and-file service members, and the documents of communications after March 23, 2018, the documents that plaintiffs seek from CMR through their subpoena are relevant, proportionate and not protected by a First Amendment privilege, and CMR's request for a protective order is without merit.

### B.

The government asks the Court to hold this matter in abeyance pending the outcome of the decision by the Ninth Circuit.  It asserts that the

issues before the Ninth Circuit bear directly on whether the discovery requested by the subpoena is relevant or protected by a privilege held by the government.   The government relies on the same reasoning to argue that, alternatively, the motion to compel should be denied or, at a minimum, that the Court should find that the only relevant period of communications is from September 14, 2017 to March 23, 2018, and that the only relevant communication is between CMR and the DoD.  As noted, the Court agrees that documents after March 23, 2018 are not relevant.  Otherwise, the government's arguments are without merit.

### 1.   Relevance

Like CMR, the government's relevance argument rests on the *Hawaii* decision and its claim that, "[s]hould the Ninth Circuit adopt the Government's position, discovery to support Plaintiffs' claims of alleged 'unconstitutional animus' would again be irrelevant to the underlying litigation."  [ECF No. 29, PageID.409].  The Court has already addressed this issue and found that plaintiffs will be entitled to discovery even if the Ninth Circuit finds that a more deferential standard of review applies.  The government also argues that the Ninth Circuit could find that the DoD's iteration of the Ban is wholly distinct from the President's 2017 directive, which would deem CMR's communication with the President, Vice

President and Executive Office of the President irrelevant.  [*Id*.].  For that
reason, the government asserts that the relevant period of communications
should be from September 14, 2017, and only communications between
CMR and the DoD should be permitted.  The Court rejects these
arguments for two reasons.

First, the Court considers the relevant timeline.  Donnelly admits to
exchanging private communications with the Trump campaign.  [ECF No.
10-1, PageID.119-20].  In July 2017, after President Trump took office,
CMR issued a special report urging the President, DoD and military
services to revoke the prior administrations' "problematic" transgender
policy directives.[12]  The following month, the President issued a press
release announcing that he was rescinding the prior administration's policy
of allowing openly transgender individuals to serve in the military and
receive military funding for sex-reassignment procedures.  [ECF No. 29-1].
The President further ordered the Secretaries of the DoD and the DHS to
submit by February 21, 2018 a plan for implementation of those directives.
[*Id*.].  As directed, Secretary Mattis issued a memorandum on February 22,
2018 adopting policies that restricting transgender persons from serving in

---

[12]
https://cmrlink.org/data/sites/85/CMRDocuments/CMR_TransgenderPolAn
alysis.pdf

the military, and the President then revoked his August 2017 directive. [ECF No. 29-3, PageID.427-38; ECF No. 29-5].  The Court cannot accept the government's arguments that the DoD's February 2018 policy is wholly unrelated to CMR's advocacy to the President and the DoD beginning before the President took office and through at least July 2017, and wholly unrelated to the President's August 2017 directive.

Secondly, any objection to relevance belongs to CMR—the party asked to produce the documents.  *See Brushart v. Adams*, No. 2:16-CV-520, 2017 WL 2964891, at *2 (S.D. Ohio July 12, 2017) (party cannot object to third-party subpoena on relevancy grounds); *White Mule Co. v. ATC Leasing Co. LLC*, No. 3:07CV00057, 2008 WL 2680273, at *4 (N.D. Ohio June 25, 2008) (same).  It is true that Judge Edmunds found that the DOJ was permitted by statute to intercede "to protect its interests."  [ECF No. 24, citing 28 U.S.C. § 517][13]  But the government does not have a cognizable interest allowing it to object to the production of documents from CMR on the grounds that they are irrelevant.  If CMR must produce irrelevant documents, and if plaintiffs pay for that production, the burden of

---

[13] "The Solicitor General, or any officer of the [DOJ], may be sent by the Attorney General to any State or district in the United States to attend to the interest of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

production will fall on them.  *See White Mule Co.,* 2008 WL 2680273 at *4

(rejecting defendant's motion to quash based on alleged irrelevance and

noting that the subpoena imposed no burden on the defendant).

## 2.    *Privilege*

The government does have an interest in protecting documents over

which it holds a privilege, and here the government asserts that a possible

deliberative process or presidential communications privilege applies.  But

plaintiffs correctly assert that the government has not met its burden of

demonstrating that the documents at issue are privileged.  *In re Grand Jury*

*Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983) ("The burden

of establishing the existence of the privilege rests with the person asserting

it.").

CMR describes itself as a "private 501(c)(3) organization with no

official or unofficial role in developing or implementing the policy Plaintiffs

challenge."  [ECF No. 10, PageID.88].  Since CMR is a private

organization, documents reflecting communication between it and the

government do not enjoy an executive or deliberative process privilege.

*See In re Sealed Case,* 121 F.3d 729, 741–42 (D.C. Cir. 1997) ("[T]he

White House has waived its claims of privilege in regard to the specific

documents that it voluntarily revealed to third parties outside the White

House."); *UnitedHealthcare Ins. Co. v. Azar*, 316 F. Supp. 3d 339, 349

(D.D.C. 2018) ("[A] document that was privileged as part of the deliberative

process can lose its privilege when revealed outside the agency."); *In re*

*Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996)

(voluntary disclosure to a third party of purported privileged

communications operates as a waiver of privilege).

  In a footnote, the government argues that the "consultant corollary" of

the deliberative process privilege applies. [ECF No. 20, PageID.403 n.2].

The government asserted at the hearing that this privilege applies to its

communication with anyone from whom it sought advice. The controlling

precedent states otherwise. The consultant corollary concept has been

used in cases examining Exemption 5 of the Freedom of Information Act

(FOIA). Exemption 5 permits agencies to withhold "inter-agency or intra-

agency memorandums or letters which would not be available by law to a

party other than an agency in litigation with the agency." 5 U.S.C. §

552(b)(5). Some circuits have "developed a 'consultant corollary' whereby

communications with temporary consultants would be considered 'intra-

agency' for the purposes of Exemption 5." *Judicial Watch, Inc. v. U.S.*

*Dep't of Transp.*, 950 F. Supp. 2d 213, 216 (D.D.C. 2013). But the Sixth

Circuit rejected this approach, noting that the Supreme Court had already

found that there was "'no textual justification'" for skipping the first condition of Exemption 5 that the communication be "intra-agency or inter-agency." *Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 548–49 (6th Cir. 2017) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001)).

Exemption 5 to FOIA is not at issue here, but other language in *Klamath* shows that the government's reliance on a consultant corollary of a privilege is unsustainable here. Exploring precedent that applied Exemption 5 to documents prepared outside of a government agency, the Court explained, "Typically, courts taking the latter view have held that the exemption extends to communications between Government agencies and outside consultants hired by them." *Id.* at 10. In other words, "the consultants may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'" *Id.* at 12. The Tribes did not meet that definition because they advocated to the Bureau of Indian Affairs on their own behalf and asserted a position that was adverse to the interest of others. *Id.* at 12-13.

The *Klamath* Court explained that Exemption 5 incorporates civil discovery privileges, such as the deliberative process privilege, *Id.* at 9, meaning that the Court's analysis of the consultant corollary theory applies

30

to the government's claim of deliberative process privilege in this case. As such, the government cannot cloak its communication with *anyone* from whom its seeks advice with the deliberative process privilege, as it argues. At most, the consultant corollary of the privilege could be applied only to communications between a government official and a consultant who was hired to operate much like an agency's personnel. Neither CMR nor Donnelly operated like government personnel. To the contrary, like the Tribes in *Klamath*, CMR advocated its own position to the government and its position was adverse to others, namely those supporting the service of transgender individuals in the military.

This leads to the conclusion that the government has not sustained its burden of demonstrating that any documents that are within the possession of CMR are covered by the deliberative process privilege. CMR agrees; it conceded at the hearing that none of its documents were privileged. That being the case, the Ninth Circuit's decision regarding whether documents in the government's possession are entitled to protection under the deliberative process privilege will have no bearing whatsoever on whether that privilege applies to documents held by CMR.

The government also alleges "separation-of-powers" concerns, citing *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 374 (2004). [ECF No.

29, PageID.404].  But plaintiffs emphasize that the government has repeatedly argued that separation-of-power principles demand that plaintiffs' exhaust its efforts to obtain relevant documents from third parties before attempting to compel them from the government.  [ECF Nos. 29-7, Page 14-15; 29-8, Page 1].  Plaintiffs argue that the government is engaged in "a multi-district shell game" by both arguing that plaintiffs must obtain document from third parties, but then objecting to plaintiffs' effort to do just that.  [ECF No. 31, PageID.680].  Plaintiffs' argument in this regard rings true.

And the government's reliance on *Cheney* is nonsensical, as that opinion addressed separation-of-powers concerns "involving the President or the Vice President" and the need to "prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities" by requiring it to bear the onerous burden of answering "overly broad discovery requests."  *Cheney*, 542 U.S. at 382, 386.  Here, requiring CMR to answer plaintiffs' discovery requests will not burden the Executive Branch or interfere with its ability to discharge its constitutional duties.

For these reasons, the Court rejects the government's arguments in favor of holding this matter in abeyance or denying plaintiffs' motion to

compel.

## IV.    Conclusion

The Court **RECOMMENDS** plaintiffs' motion to compel **[ECF No. 1]** be **GRANTED IN PART AND DENIED IN PART**; and that CMR's motion for protective order **[ECF No. 10]** be **GRANTED IN PART AND DENIED IN PART.**  Specifically, plaintiffs' subpoena request should be narrowed to include a time period from June 16, 2015 to March 23, 2018, and the DoD should be redefined as the Secretary of Defense, the Deputy Secretary of Defense, any Undersecretary of Defense, any Assistant Secretary of Defense, any Deputy Assistant Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and any member of the Panel of Experts who assisted in crafting the February 22, 2018 iteration of the Ban and the DoD Report and Recommendations on Military Service by Transgender Persons. [See ECF Nos. 29-2 to 29-4].

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: November 6, 2018

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service

33

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of

HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers

Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in

length and complexity to the objections**, but there is otherwise no page

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 6, 2018.

s/Marlena Williams____
MARLENA WILLIAMS
Case Manager
